Judge Pregersen, Judge Fletcher, Judge Clifton, my name is Carl. The appellant in this matter are Courtney G. and her parents, Elizabeth G. and Michael P., her custodial grandparent. This case really asks the question of whether or not the state's wait-to-fail policy comports with the purposes of IDEA and particularly its child-find requirement. IDEA has three essential purposes. The first purpose is integration. That is, we move away from a system in the 1970s that segregates children or prohibits them in some cases from attending public school and integrate them as far as possible into the mainstream. The second important policy embodied in IDEA is the concept of the least restrictive environment, and that is that children with special needs should be provided services in the least restrictive environment possible so that they can move toward mainstreaming as quickly as they can. Well, in this case, they refused to provide any services. Is that correct? That is correct, Your Honor. And that's the third point, the third policy of IDEA. And its most important policy is the child-find provision. The child-find provision of IDEA requires the Department of Education to identify children on a mere suspicion of eligibility. And the reason for that is quite clear. Providing services to children on a mere suspicion that they may be eligible will be benign at the very least and perhaps importantly helpful for children who are, in fact, in need of those services. I'm confused here. You're saying that the state is obligated to provide services, and maybe that's in the definition of services, merely upon a suspicion? That's what the case law says. And, in fact, a judge even more senior to these esteemed jurists, Judge Sam King of our own bench in the Carrie Rae case, made that exact point. Then why do we deal with regulations at all? Because suspicion of services are provided. I'm kind of lost as to what all the regulations are about then. Well, the regulations define what the department ought to be looking at in forming its opinion of the child's performance. One thing they cannot do, and one thing the department cannot do, is use the discrepancy measures as the sole measure of a child's abilities and a But it doesn't appear that's what the state did here anyway. Well, I'm not sure how that matters. I'm going to show you that that's exactly what they did by referring you to the record, Judge Clifton. In particular, throughout this child's educational career from 2005 through 2006, the department did two things. They refused to assess her for eligibility under the category of dyslexia, which is one of the specific learning disabilities. And they expressly said repeatedly, you can't get special education because you have not met the discrepancy measures. Now, those discrepancy measures were rejected. Let me stop you there. Okay. Because the hearings officer specifically when addressing that issue didn't say it's okay for the state to look only at the severe discrepancy model. But the hearings officer says the facts show the DOE used alternative methods to determine if a student was eligible. Well, let's see if he was right about that, because I think the record shows that he was facially incorrect and that the DOE in repeated statements and declarations of its reasons for denying services told the parents that it was denying those services because discrepancy measures were not met. Well, that doesn't prove the contrary. That doesn't mean that the state didn't use any other measure. And that's the point made by the hearings officer. Well, if the state were using, let me just run through them, Judge Clifton, and I think the question is answered. The state looked at and disregarded that other information. That's not consideration. Consideration means I look at and evaluate the information being This child is, as Ms. Wong describes her, well, actually, I'll back up. In April of 2006, the prior written notice says that Courtney has lagged significantly behind her peers in reading for several years. Interventions to date have shown little success. Further reading instruction is rejected because instruction to date has not been successful. But the punchline of this prior written notice is that Courtney was evaluated in the spring of 2005 and found not eligible using the typical cognitive achievement discrepancy method. That's the bottom line for the DOE, and it never changes. Well, you see, you're still not answering my question, which is the hearings officer said something different, and you're trying to go back and retry the case in the first instance. Well, I think that that is appropriate given the fact that Judge Gilmour, in her review, is supposed to do just that. It's de novo review in the United States District Court, and the court is supposed to review those facts. The court is supposed to look at whether or not the hearing officer properly evaluated the facts and came to the right conclusions. The fact is that repeatedly requests were made to have this child evaluated under the criteria of specific learning disability, and this conclusion, which began in 2005, was reiterated in 2006 in the prior written notice. That's Excerpt of Record 96. And by the way, that notice is intended to give the parents notice from the department as to the reason for its decision so that they can agree or disagree with it, and if they disagree, seek due process. I'm looking at a hearings officer report that goes through not simply the discrepancy standards, but talks about the expert witness testimony, talks about other standards, talks at length about the testimony of the child's fifth and sixth grade teacher, none of which has to do with the standard that you say is improper. What am I supposed to do with all that other discussion? Pretend it doesn't exist? Well, you're supposed to look at what the law requires, and what the statute requires in this case is that the department, and this is Section 1414 of the statute, requires the department to provide notice to the parents of what the basis or bases of the decision is for either giving a particular program or denying a particular program. And I'll refer you to the record again, moving forward at Excerpt of Record 86, the same rationale is given. The discrepancy measures are not met. So you really don't want to talk about what the hearings officer looked at? The hearings officer was good. I've asked like three times to talk about that. I'm defined to do so. He's wrong. I mean, he is wrong on the fact that he said that there is a consideration of these factors is not borne out in the record, and I'm permitted to argue that. You can, but he talks about the specific submission and testimony by the fifth and sixth grade teacher. You can't pretend that doesn't exist. What I can tell you is that the statute itself prohibits that from being used for purposes of evaluation. The statute says that those types of assessments shall not be considered. You're talking about the severe discrepancy model, are you? No. In response to Judge Clifton's specific question about what the teachers think, the teachers' assessments, the statute says, shall not be considered to be an evaluation for eligibility for special education and related services. That's 20 U.S.C. 1414a1e. Now, the hearings officer can say anything, but that doesn't mean what he has said is what the teachers say to be used for purposes of an eligibility determination. Independent objective criteria are supposed to be used. This is what the statute says. Now, if the teacher reports that the child is reading at grade level, you're supposed to disregard that? I'm telling you what the statute says, Judge Clifton. It's a matter of congressional policy. It's not me. The statute says these shall not be considered to be an evaluation for eligibility. Eligibility determinations are specific, and they're very important to the statute. Now, they may be considered in tailoring the child's program once the eligibility determination has been made, but it's clear from the statutory language that they can't be used for purposes of eligibility, and yet that's what the hearing officer relied on, and that's what the hearing officer thought was important. Contrary to the clinical psychologist, contrary to Dr. Ferguson, who herself consults and advises the DOE, Dr. Ellen Smith, Dr. Sherwitz, and Dr. Dowrick, all of whom opined, and Dr. Murphy Hanzard, that this is an at-risk child that the department should have identified as dyslexic three years prior based on the data that they had, and their refusal to do so put her at risk for failure. Now, why is she at risk for failure? Because she can't read. Counsel, as I look at this case, everybody agrees that the child is dyslexic. Is there any dispute about that? Well, that's only true as of the hearing. Prior to the request for due process, the 86 denied the parent's request for evaluation under the criteria. Currently, does everybody agree that she's dyslexic? That is correct, Your Honor. Okay. And apparently, the child has a rather low IQ. Is that? Low average is the measure. Yeah. Based on that, it seems to me that what the district is saying, well, because she's got a low mentality, she's never going to do better, so why should we bother to help her with dyslexic training? Is that right? That is exactly what the district educational specialist, Ms. Reedy, said in her email, which is, you know, this child's never going to do very well. Courtney's grandfather needs to come to grips with this, and it would require too much time and effort to help Courtney, which is directly inconsistent with what IDAA is intended to do. IDAA is intended to invest time in children, to bring them along within their capacities, and not to some ideal, but at least to address directly the manifest issues that are shown by the object of facts regarding, in this case, reading fluency. So the school district never did provide her with dyslexic services in order to see whether they worked or not. That is correct. She was never identified as dyslexic, and she was never provided a specialized program for dyslexic children. How do you identify a dyslexic child? There is psychological testing that is done, and in this particular case, the grandparent requested testing at the DOE expense, which is what the statute requires. That was denied as well. Out of his own pocket, he had to pay a substantial sum of money, and that people of means, procure the neuropsychological evaluation, and that neuropsychological evaluation, which is a battery of six to eight tests, identified this particular child as having dyslexia, being at risk. That diagnosis was confirmed in rebuttal by Dr. Sherwitz, who is a leading national expert in this field. So there is no question that this child is dyslexic and should have been receiving the services, and for three years the department stonewalled it. And the parents provided those special services for the child. That is correct, Your Honor. Again, out of pocket. Out of pocket, and the child progressed. That is correct, Your Honor. That is what the record shows, that once the child got a multisensory reading program as recommended by Dr. Ferguson and the other clinical psychologists and leading specialists who evaluated, she began to make progress. So contrary to Ms. Reedy, who is not a psychologist, her assessment that this child just was never going to make any progress, what's borne out by the record is that once the child got this multisensory, intensive educational supports, she began to read better. And there's no evidence in the record to contradict that. I see the yellow light is on, and I'd like to reserve some time for rebuttal. All right. Thank you. This is an important case. Thank you very much. May it please the Court. Rebecca Copeland, appearing on behalf of the Department of Education. I'd like to start by making a few points in response to some of the questions that were raised during Appellate's argument. First, the hearings officer did make findings that the severe discrepancy method wasn't the only thing considered in determining whether or not Courtenay was eligible for special education services. Those findings are entitled to deference under this Court's case law. Second, the severe discrepancy method and the other areas that were used to assess Courtenay is what resulted in the determination that she was not eligible for special education services. The Department does not deny that Courtenay has dyslexia. The issue is whether or not that dyslexia is to a degree that requires her to have special education services, and that's under the IDEA's definition of a child with a disability. We do have measures that suggest she is, at least at various times, multiple grade levels behind her actual grade in reading. Why doesn't that suggest she needs the assistance? Some of the evidence did show that. However, other evidence showed that she was proceeding adequately and average in her regular education classroom. The testimony of Fran Tannin, school psychologist, Lisa Berlindo, the general education teacher, and Beverly Wong, the Department's resource teacher, all showed that strategies that were being employed in Courtenay's regular education classroom were leading to improvement and that she was performing at an average level. I'd also like to mention that those interventions were made in class and the testimony was provided in particular at the November 29, 2006 eligibility meeting. All of this testimony is consistent with the interventions that were being performed in the classroom while Courtenay was being assessed on whether or not she needed special education services and showed that she did not. And she never did receive special dyslexic services? She did not receive services under the IDEA because she was determined to be not eligible. One of the ways that the Department determined that was under the severe discrepancy method, which requires a look at whether or not there is a severe discrepancy between her academic achievement and intellectual or cognitive ability. This is something that is a bit puzzling to me. If you had a child who was mentally slow, shall we say, sometimes those children would be entitled to special IDEA services. Isn't that correct? That's correct. If they're determined to need special education services because of whatever disability they have. And in this case, Courtenay's was a specific learning disability or dyslexia. And her dyslexia was not to the degree that she needed special education services because she was getting by in the regular classroom on an average level with interventions. Number one, they were not diagnosing her as dyslexic. They were simply looking at the kind of classroom. Is that correct? That's correct. Why do you say that they conceived that she was dyslexic at that time when that wasn't true? That's what you said. Did I hear you correctly? Well, I said that the Department doesn't dispute that she has dyslexia and we haven't been disputing that for some time now. But the Department didn't recognize that early on when she was a child. The Department said, well, she's got a low IQ and she's behind in her class, so why should we waste money on her? But under Section 13... What is it all about? There's some evidence to the record that some things were said like that, but they still conducted the assessments that they were required to under the IDEA. Those thoughts ran through the minds of the Department. Am I right? There's some evidence to that, yes, Your Honor. Okay. But under the definition of a child with a disability section... What does that tell you then? It tells you that disability itself is not enough to qualify for IDEA services. You also need to have... that disability needs to require you to need special education services and the evidence showed that Courtney didn't need special education services in order to perform on an average level in a regular education classroom. It would seem that when a child is shown to be at several periods performing below grade level, what should happen would be the determination of the level of services that she needed, not that we'll give her none because she's marginally possibly improving. Well, I think there were numerous support and evaluation meetings that are shown in the record. A variety of assessments were conducted. But nothing that gave her services that would qualify to help a person with dyslexia. Because she was determined to be not eligible for IDEA-specific services. There were some interventions going on in the classroom while Courtney was being assessed for eligibility, which happened over several eligibility meetings over several grades. But she was determined at each of those meetings to not be eligible for special education services, which is why she didn't get the IDEA services. She was getting interventions in class, and that's as evidenced by the testimony of her regular education classroom teachers, as well as a few of the other district's witnesses that testified at some of the eligibility meetings. And these were services that were beyond what were given to the regular students performing adequately? Well, they were specific interventions being given by the teachers to Courtney, yes. They were working with Courtney in class in a way that was trying to see if she was able to perform in the regular education classroom, and she was able to. Despite showing that for several years, she was falling way behind. Actually, the testimony of the fourth and fifth grade teachers was that the interventions in class showed that Courtney was improving at that point. And that's in the record at the 11-2906 eligibility meeting, in addition to the testimony in the transcript. So what was her grade point average and her LSAT score? Fortunately, she's not old enough to take the LSAT, and I'm not sure that most of us would want to. How about her SAT score? There's no SAT score. She was still a bit young for that as well. I believe she might just now be entering the ninth grade, if I'm not mistaken. She was in elementary school at the time. I know. This whole thing just makes me feel like, you know, they looked at her and said, well, she's got a low IQ. So she's kind of reading up to that capacity, and that's about it. Like I said earlier, if you agreed, why should we spend any more money on her? But even if that may have been the personal viewpoint of some of the people... Every child is an asset to this country. That's true. And even if we help them improve a little, then they can go on and maybe get a job and work and pay taxes. Otherwise, they may never have a chance for any kind of sense of independence and stronger sense of self-worth. So, I mean, that's the sense I get out of this. I understand the court's concern, but... You know, I barely got through grammar school, but I knew I wasn't stupid. And I just had bad teachers that didn't really care about me. Well, I think that this evidence shows that they did care about Courtney and that they did comply with the child-fine provisions. Excerpts of Record 3, Petitioners' Exhibits 1 through 13, the second supplemental excerpts of Record, Department Exhibits 1 through 24, the administrative hearing, and the evidence considered and set forth by the hearings officer all shows that the department did conduct a number of eligibility meetings, support meetings, assessments by Courtney, both in its own expense and considering the assessments that were provided by Courtney's mother and grandfather. But based on those, nevertheless determined that she was not eligible for special education services. In the record, is there anything now as to the level of her dyslexia, how severe it is? There's no specific... I'm not sure exactly how, like, what the levels of dyslexia are, but there's evidence and there's conflicting evidence of the record of the degree to her dyslexia. But there is evidence that under the severe discrepancy method, her composite scores on the Woodcock-Johnson test were average. Her composite scores on the Kauffman test were average, and none of those scores fell below her IQ test as tested on the West Shore test. Dr. Abigail Royston, the school psychologist, confirmed these findings, as did the testimony at the last eligibility meeting in particular held on 11-26. My question was just simple. We don't know really what the level of her dyslexia is. No, that's correct. And just for the record, sometimes I'm prone to exaggerate, but my problem with my A6 teacher was that she didn't like the white mouse that I used to bring to class. But she loved my sister who came a year later. I guess that's sometimes what happens when you have siblings. I know, and who's still hot on my heels, trailing, you know, getting ahead, too. Okay. No, it's... I mean, there are a lot of people that have dyslexia who go on, get through college through exerting a certain amount of effort, and go on through law school and do well. That's true. I mean, dyslexia has degrees, and for some people it can be worse, and for other people it's mild. And for some people, I suppose, if they're faced with it when they're young and they're not given any help, then they may just conclude that, well, I'm never going to amount to anything, so that's going to be my life. And other people get help and get some encouragement and go on to great success. But under the IDEA, not every child qualifies for those specific type of special education services. Courtney's dyslexia was to a mild enough degree that the eligibility team concluded after a number of years of evaluating her in the assessments and the interventions that were already being performed in class, that she didn't need the specific IDEA services. Yeah, but she did better when she had those specific services, didn't she? Well, I mean, she's in assets now, so I'm sure that most children in a private school would be doing better, but the IDEA does not require the Department of Education to provide a first-class education. Another thing I'd like to remind the court is that just prior to when Courtney was... Is that the position of the Hawaii Department of Education, that they're not required to provide a first-class education? The position is that if a child is entitled to special education services, they must provide those. I'm not familiar with California. Before Courtney was withdrawn into the private school, the eligibility team also did find her eligible for 501 services, which would have been a... I mean, that's a different statute, but those are services that would have occurred in the regular education classroom and that the eligibility team believed would have assisted Courtney based on the results of the assessments that had been conducted. However, she was withdrawn prior to that plan being implemented. The real issue in this case is whether or not... Not that she has dyslexia, because, again, we don't dispute that, but whether or not that dyslexia rose to a level that required her to have special education services, and based on the numerous assessments and meetings that were held in this case, Courtney was found ineligible for the specific IDEA services. If the court doesn't have any questions, thank you so much. Any rebuttal? Thank you. One important rebuttal point that I'd like to make, Your Honors, is that Ms. Copeland, although she did a very competent job in representing the DOE here, did not directly answer the question about the dyslexia diagnosis. Yes, the DOE agrees today that Courtney is dyslexic, but I call the court's attention to the November 2006 meeting, and that's excerpt of Record 79 in particular. This is after the Murphy hazard diagnosis has been made and after the parents have procured the neuropsych evaluation concluding that Courtney is dyslexic. At the middle of ER 79, which is the meeting notes of that ultimate meeting, Ms. Tannen, who is a master's level person, not a clinical psychologist like Dr. Murphy Hazard, stated that she does not agree with Dr. Murphy Hazard's statement that these data form what Shaywitz, that would be Dr. Shaywitz, considers to be a classic pattern of a dyslexic reader. Ms. Tannen suggested Courtney use a ruler or her finger to track written material. That was her suggestion for Courtney's dyslexic program. You compare that to Dr. Ferguson, who is a clinical psychologist, pardon me, a... Said she should use a ruler? Or her finger. That was a suggestion... It's not a ruler, it's a rule. No. I got a D in woodshop dancing when I held it up. What is this? I said ruler. He said it's a rule. Mr. Swanson is his name. And bless him for his English efficacy. Just one other point, please, and that is that the first Rove case, which is a recent case from the United States Supreme Court, clearly applies to this case. It says parents don't have to wait until their children fail and can't be redeemed. They have the opportunity to seek services and provide them, and where the department, as it does here, refuses over a period of years, they can take the child off the merry-go-round and get them the services that will allow them to have the kind of meaningful life and productive life that IDEA is supposed to provide. I want to thank the Court for its attention. I'll be happy to answer any questions. I see that my time is otherwise up. You specialize in this field. I do, Your Honor. Thank you very much. Thank you. The matter is submitted. And number two. Calm down and listen in order. May it please the Court.
judges: Fletcher B. , Pregerson, Clifton